NATIONAL BANK OF GEORGIA, Plaintiff,

v.

KENNESAW LIFE AND ACCIDENT INSURANCE COMPANY, Defendant-Appellant,

Credit Management Association of Southern California, Defendant-Appellee.

No. 85–8782.

United States Court of Appeals, Eleventh Circuit.

Oct. 7, 1986.

Douglas L. Hallett, Adams, Duque & Hazeltine, Los Angeles, Cal., for defendant-appellant.

Robert W. Beynart, Atlanta, Ga., for National Bank of Georgia.

William K. Carmichael, Atlanta, Ga., Kent Keller, Los Angeles, Cal., for Credit Management Ass'n of Southern California.

Before RONEY, Chief Judge, CLARK, Circuit Judge, and GIBSON *, Senior Circuit Judge.

CLARK, Circuit Judge:

This appeal concerns an interpleader action filed by plaintiff-appellee National Bank of Georgia (NBG), disinterested stakeholder in a $450,000 bank account. NBG requested that the court below deter-

mine which of two claimants should receive the bank account. Defendant-appellee Credit Management Association claimed the account as receiver for Continental Organization of Medical, Professional and Technical Employees (COMPETE), an organization providing various insurance programs on a group basis to small employers and their employees. Credit Management argued that since the account was titled "COMPETE Master Trust," COMPETE had title to the funds therein. Defendant-appellant Kennesaw Life & Accident Insurance Company (Kennesaw) disagreed and claimed the account on two theories. First, Kennesaw argued that despite the name on the account, it was the true owner of the account. Second, Kennesaw argued in the alternative that even if it was not the owner of the account itself, it had a superior right to the funds therein because they constitute trust funds held by COMPETE on behalf of Kennesaw. The district court rejected Kennesaw's arguments and awarded the funds to Credit Management. Kennesaw appeals, asserting errors of fact and law. We reverse.

I. FACTS

In March, 1981, COMPETE organized a trust to offer various insurance benefits[1] to employees of its employer members. According to the Declaration of Trust, the trust's principal purpose was to provide benefits by purchasing policies of insurance from independent insurance companies. The trust was also authorized to pay benefits directly from membership dues, in lieu of or in addition to procuring insurance policies. In fact, both fully insured and self-insured programs were offered to members.

All membership dues, after deduction of various expenses, were to comprise a trust fund. A custodial trustee was to be appointed to receive and hold all trust assets, including the fund, in its own name or that of a nominee. Disbursement could be made only on the written direction of the

---

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. Benefits included life, health and accident, vision and dental care, and legal services.

trust's Benefit Committee. No investment of the fund was required unless directed by the benefit committee. Although NBG was the duly appointed custodial trustee for that portion of the fund to be used for payment of Kennesaw premiums, it never held any trust assets. It held only the bank account at issue.

Collection of the trust fund was not managed by COMPETE or its custodial trustee. Instead, COMPETE contracted with one of its affiliated companies, Far West Administrators, Inc. (Far West), to collect membership dues, deduct commissions and expenses, forward premiums to insurance carriers and pay benefits to employees either on behalf of the carriers or COMPETE's self-insurance programs.

Among the carriers providing insurance to COMPETE's members was appellant Kennesaw. At the time the trust was organized in March, 1981, Kennesaw issued a master policy to COMPETE in order to pay benefits in excess of $25,000 on the trust's self-insured programs. In July, 1981, Kennesaw issued the trust a second but fully insured policy for life, health and accident benefits. At about the same time, Kennesaw entered into an Administrative Services Agreement with Far West, requiring Far West to provide the same types of services to Kennesaw as those rendered under Far West's agreement with COMPETE.

The Services Agreement also contained detailed instructions for the handling of monies due Kennesaw. To a certain extent, these instructions overlapped with provisions in the previously described Declaration of Trust. Membership dues, including pro-rated premiums, were to be sent by members to a bank lock box in California, where Far West would collect them on a daily basis. Kennesaw's premiums were to be broken out from those of other carriers, commissions and service fees deducted, and then the net amount deposited weekly in a "holding account." Funds in the holding account would then be deposited in Kennesaw checking accounts for purposes of paying claims under Kennesaw's fully insured COMPETE policy. Kennesaw and Far West shared authority to write checks on those accounts but only Kennesaw had the right to invest the holding and checking account funds. According to the Agreement, the holding account was to be opened in trust for Kennesaw, not by Far West but by COMPETE as the master policyholder. COMPETE's acceptance of this provision was evidenced by its signature on the service agreement.

The bank account which is the subject of this litigation was opened at NBG in late June or early July under the name "COMPETE Master Trust." This was in conjunction with the inception of the policy fully insuring beneficiaries for life, health and accident coverage. From July, 1981 to February, 1982, Far West deposited various sums into the account. Periodically, a portion of the sums were transferred by NBG into certain checking accounts titled "Kennesaw A & H Claims Payment" and "Kennesaw Life Claims Payment." The balance of the COMPETE account was then invested at the direction of Kennesaw. Problems soon developed, however, as deposits were not made weekly in accordance with the Services Agreement. By November, 1981, premium remittances had fallen in arrears by $500,000. Kennesaw demanded that the account be made current, and Far West complied in part by January, 1982. Two months later, Kennesaw realized that both Far West and COMPETE were in deep financial trouble. Kennesaw requested that NBG turn over all funds in the account at issue. At approximately the same time, NBG received a similar request from Credit Management Association as receiver for Far West.[2] Faced with these conflicting demands, NBG paid the funds into the court registry and filed this interpleader action to determine rightful ownership of the funds.

The district court conducted a bench trial on the issue of ownership and held that the

---

**2.** At the time of its request, Credit Management was receiver only for Far West. Subsequently, it was appointed receiver for COMPETE, the COMPETE trust, and other affiliated entities.

funds presumptively belonged to COMPETE as title holder of the account. The court also found that the account had been opened as the Custodial Account described in the Declaration of Trust, and NBG had been appointed custodial trustee. Under the Declaration, the purpose of the account was to pay benefits to employee beneficiaries. Consistent with this purpose, the court found evidence that the funds in the account had been drawn from the general receipts of COMPETE and not simply that portion representing premiums due to Kennesaw.[3] In light of these facts, Kennesaw had no right to the funds under the Services Agreement with Far West.

According to the district court, Kennesaw could claim against the account only to the extent it could prove that the money in the NBG account was the same money which Far West had collected as Kennesaw premiums in the California lock box. The court found that Kennesaw had failed to trace the funds satisfactorily through the Far West and COMPETE accounts in California. In fact, the evidence showed that some or all of the money actually collected as Kennesaw premiums had been dissipated or used by COMPETE for purposes other than payment of premiums. Consequently, Kennesaw had no right to any of the funds in the NBG account. Judgment was entered in favor of COMPETE's receiver, Credit Management.

## II. ISSUES ON APPEAL

Appellant Kennesaw contests the district court's award of the funds to the receiver on two grounds. First, Kennesaw claims that the district court erred in not recognizing its ownership of the bank account at issue. Kennesaw contends that it rebutted any presumption of ownership in COMPETE by demonstrating that the account was opened pursuant to the Services Agreement and designed to receive only premiums due to Kennesaw, not general funds of COMPETE. Thus, Kennesaw is the true owner of the account and has a legal right to the funds at issue, without resort to tracing.

Second, Kennesaw argues that even if the district court was correct in finding legal title to the account in COMPETE, it nonetheless erred in rejecting Kennesaw's equitable claim to the funds. Kennesaw argued that premiums had been collected in trust for its benefit and then deposited in the account at issue. Therefore, it should collect the funds. The district court accepted Kennesaw's equitable theory but found the proof insufficient. Kennesaw asserts that the court required an excessive amount of tracing. Kennesaw claims that under applicable law, it need only show that its premiums were received in trust by Far West and ultimately segregated in the account at issue.

## III. DISCUSSION

Having reviewed the record in detail, we find that the district court should have held for Kennesaw on the first theory advanced, its legal ownership of the account. The correct standard for ownership in this case is determined by Georgia law since all the parties in their various agreements selected that law as controlling. Like most states, Georgia recognizes that the name or title of a bank account creates a presumption of ownership in the titleholder. *See Granade v. Augusta Fire Department Credit Union*, 118 Ga.App. 157, 162 S.E.2d 870 (1968). That presumption, however, is rebuttable and ownership may be placed in some entity other than the titleholder. *See id.* 162 S.E.2d at 872.

---

**3.** The court's conclusion about the source of the funds in the account rested on detailed testimony about the flow of funds from the California lock box to the NBG account. Contrary to the Services Agreement, membership dues were not properly segregated nor promptly deposited in the NBG account. Instead funds which should have gone to Kennesaw remained commingled with COMPETE's other funds. The money was then transferred to one of two COMPETE accounts in California, from which COMPETE paid general expenses. At times the funds in these accounts, including the premiums due Kennesaw, were entirely dissipated on COMPETE general expenditures. Thus the funds later transferred to NBG were comprised not only of premiums earmarked for Kennesaw but also general funds of COMPETE forwarded to make up for dissipated premiums. *See* Trial Record Vol. 4, pp. 12–20.

The lower court in this case acknowledged these principles in its opinion, but then failed to apply them to the evidence presented. Instead, the district court looked to the title of the account and considered whether the creation of a "COMPETE Master Trust" account was more consistent with the provisions of the Declaration of Trust or with Kennesaw's Services Agreement with Far West. Since the Services Agreement required a "holding account" rather than a trust account,[4] the court awarded ownership to COMPETE and its receiver.

We concede that this method of analysis greatly simplifies the matter of ownership, an issue complicated by the existence of several interrelated parties, vague agreements creating dual loyalties, and esoteric insurance practices. Nonetheless, such a narrow approach is clearly inconsistent with the breadth of inquiry required by Georgia law. Ownership of the account depends not only upon the account title and the trust and contract documents in evidence, but also upon the actual operation of the account. Particularly important are facts concerning which party opened the account, which party controlled the account, *see Granade, supra,* the source of the funds, *see Eagle & Phenix Mfg. Co. v. Belcher,* 89 Ga. 218, 15 S.E. 482 (1892), and their purpose, *Mayer v. Chattahoochee National Bank,* 51 Ga. 325 (1874).

■ Here the account was opened by personnel from COMPETE, Far West and Kennesaw. Witnesses from Far West, Kennesaw and NBG all testified that the account was created solely to receive premiums due to Kennesaw for COMPETE's health, accident and life policy.[5] When Kennesaw realized that its name did not appear in the account title, it requested a resolution from the COMPETE Benefit Committee granting it full control over the account. This resolution was issued in September, 1981, and was honored by NBG until the receiver made a claim against the account in March, 1982. Prior to that time, NBG considered Kennesaw the bank customer for this account and it sent all bank statements to Kennesaw.

Indeed, Kennesaw's interest in the account was so clear to all parties involved that the disbursement and investment policy for the account was set solely with regard to Kennesaw's needs and goals without consultation or approval from COMPETE.[6] As originally conceived, premium funds would be deposited into the account by Far West and then immediately transferred to Kennesaw checking accounts to facilitate payment of claims under Kennesaw's policy with COMPETE. Since this arrangement did not maximize Kennesaw's return on its premiums, Kennesaw elected to leave its premiums in the COMPETE trust account until needed for payment of specific claims. The trust account balance was then fully invested on a daily basis. Although the investment income remained in the trust account, NBG kept separate records for the investment income and considered it property of Kennesaw rather than COMPETE. Thus, the account's operation indicates that, despite its name, it belonged to Kennesaw rather than COMPETE.

■ In light of this evidence, the district court was clearly erroneous in finding the

---

**4.** It is not clear whether the Services Agreement actually required the title "Kennesaw Holding Account" or merely used that designation as a defined term for clarity and brevity in the Agreement. Furthermore, the account title did not match the provisions of trust Declaration any better than it fit the Services Agreement. The Declaration stated that any account created pursuant to it should be held in the custodian's name or the name of a nominee. NBG's name never appeared on the account at issue, nor was the trust its nominee.

**5.** See testimony of William J. Ruth, former president of Kennesaw, at Trial Record Vol. 1, p. 102; testimony of Murray F. Rubin, former president of Far West Administrators, at Trial Record Vol. 2, pp. 116–24; testimony of Raymond Sapp, former group vice president of the NBG trust department, at Trial Record Vol. 2, p. 165. Personnel from COMPETE did not appear at trial, as none could be located by the litigants.

**6.** See testimony of Raymond Sapp at Trial Record Vol. 2, pp. 168–170.

following facts. First, the court erred in describing the purpose of this account as "paying administrative expenses and benefits" to COMPETE participants. The evidence clearly shows that the account was created to pay premiums due to Kennesaw. No administrative expenses were ever paid from this account since all expenses were deducted by Far West before funds were transferred to NBG. The fact that benefits were paid from this account is merely a reflection of the fact that all insurance benefits ultimately derive from premiums paid and the investment income accrued thereon. There is no question that Kennesaw has paid all benefits owed under its policy and that these benefits exceeded the amount in the account.[7]

■ Second, the district court erred in disregarding the probative value of the COMPETE Benefit Committee resolution acknowledging Kennesaw's control over the account. The Court held that the resolution failed to pass control because it had not been executed in conformity with trust Declaration requirements. In fact, the Declaration states that valid resolutions may be executed in any manner approved by the Benefit Committee's bylaws, rules or regulations. Although those bylaws, rules and regulations were not put in evidence, the practices of the Benefit Committee were made clear by other evidence. The resolution appointing NBG custodial trustee was introduced at trial, bearing the same type of execution as the resolution acknowledging control. This fact suggests that the Benefit Committee had adopted a practice of executing binding resolutions in a manner different from that authorized by the Declaration. Indeed, NBG as custodial trustee seems to have been aware of this practice as it honored the resolution without question for almost six months. In light of these facts and the circumstances surrounding the issuance of the resolution,

the district court should have given this evidence due weight in determining ownership of the account.

The district court likewise erred in certain of its conclusions of law. The district court found a presumption of ownership in favor of COMPETE and immediately proceeded to evaluate Kennesaw's claim to the funds on a trust fund tracing theory. Had the district court properly considered Kennesaw's rebuttal evidence on the purpose of the account and Kennesaw's control over it, the presumption in favor of COMPETE would have dissolved. All of the facts and circumstances surrounding the operation of the account indicate that it belonged to Kennesaw. Thus, the district court erred in not awarding Kennesaw the account, regardless of Kennesaw's inability to trace funds. The judgment of the district court is therefore

REVERSED.

---

**7.** The district court's conclusion might have been more plausible if the account at NBG were COMPETE's only account or if COMPETE had beneficiaries located in Georgia. The record indicates that virtually all beneficiaries resided in the western United States and that COMPETE maintained several accounts in California for the purpose of paying benefits. COMPETE's only ties to Georgia were its policies with Kennesaw, which required remittance of premiums and thus a bank account in this state.